IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JASON MESSER,
        Plaintiff,

                                                                      CV 06-826-PK

v.                                                        OPINION AND ORDER

HO SPORTS COMPANY, INC.,
MOTION WATER SPORTS, INC.,
and CONNELLY SKIS, INC.,
        Defendants.

PAPAK, Magistrate Judge:

        Plaintiff Jason Messer invented and patented a traction pad that permitted the boards employed in the sport of wakeboarding to be used without bindings, so that friction alone would be sufficient to allow a user to control and stay upright on the board. According to Messer, this innovation ushered in a new, related water-sport now known as "wakeskating."

        Messer's patent issued in June 1998 as U.S. Patent No. 5,766,051 (the "'051 Patent"). In this action, Messer alleges that wakeskates marketed by defendants HO Sports Company, Inc.,

Page 1 - OPINION AND ORDER

Motion Water Sports, Inc., and Connelly Skis, Inc., infringe one or more claims of the '051 Patent. Now before the court are the parties' claim construction briefs. The disputed terms are construed below.

## FACTUAL BACKGROUND

In their initial briefing, defendants identified thirteen claim terms for construction by this court: "wakeboard traction pad," "end," "height," "high front end," "low back end," "roughened surface," "approximately one and one half inches," "approximately nine and one half inches," "approximately one fourth inch," "approximately eleven and one fourth inches," "approximately one fourth to one fifth," "approximately three fourths to four fifths," and "wakeboard traction surface." As discussed in greater detail below, plaintiff has stipulated to defendants' proposed construction of eight of those thirteen terms.

The '051 Patent's Abstract describes the traction pad in part as follows:

> The *wakeboard traction pad* has a gently tapering foot bed area, a more significantly sloped kicktail, and a center arch support that helps to define two concave depressions between the sides of the wakeboard traction pad for engagement by the heel and/or ball of the foot.

'051 Patent, Abstract (disputed terms italicized). The traction pad is further described in the "Summary of the Invention" section of the patent specification as "approximately the size of a human foot in square area." '051 Patent, 3:13-14. The specification further states that:

> In order to enhance the available contact surface area between the wakeboard traction pad of the present invention and the wakeboard rider's foot, a central arch support is provided that delivers a central ridge generally traveling the length of the wakeboard traction pad.

'051 Patent, 3:29-33.

By contrast, the first independent claim of the '051 patent makes no mention of either the

Page 2 - OPINION AND ORDER

central arch support or the approximate square area of the wakeboard traction pad; these features are, however, described in various dependent claims as recited below. Instead, Claim 1 describes:

> A *wakeboard traction pad* for providing sure-footed engagement of a wakeboard by a rider thereof, comprising:
>     a top surface for engagement by the rider's feet;
>     a *high front end* having a first *height* and a first width;
>     a *low back end* coupled to said *high front end*, said *low back end* having a second *height* and a second width;
>     said first *height* being taller than said second *height*; and
>     said top surface sloping or tapering to mediate said first and second *height*; whereby:
>     the *wakeboard traction pad* provides a sloping surface from said *high front end* to said *low back end* to provide an angled traction surface and to provide the rider traction upon the wakeboard while riding the wakeboard.

'051 Patent, 9:18-32 (disputed terms italicized).

Claims 2-18 and 20 are all dependent on Claim 1. Claim 2 describes the traction pad of Claim 1, wherein the "top surface" comprises "a *roughened surface*, said *roughened surface* providing additional traction to the rider upon the wakeboard." '051 Patent, 9:18-32 (disputed terms italicized). Claims 3 and 4 describe the traction pad of Claim 2 with additional features designed to channel water away from the rider's foot.

Claim 5 describes the traction pad of Claim 1, with the additional limitation that the *"high front end"* is "*approximately one and one half inches* (1 ½") tall." '051 Patent, 9:52-54 (disputed terms italicized). Claim 6 describes the traction pad of Claim 5, with the limitation that the "*high front end*" is, in addition, "*approximately nine and one-half inches* (9 ½") wide." '051 Patent, 9:56-58 (disputed terms italicized).

Claim 7 describes the traction pad of Claim 1, with the further limitation that the "*low

*back end*" is "*approximately one fourth inch* (¼") tall." '051 Patent, 9:60-62 (disputed terms italicized). Claim 8 describes the traction pad of Claim 7, with the limitation that the "*low back end*" is also "*approximately eleven and one fourth inches* (11 ¼") wide." '051 Patent, 9:64-66 (disputed terms italicized). Claim 9 describes the traction pad of Claim 8, with the further limitation that the pad tapers, being narrower at its front end than at its back end.

Claim 10 describes the traction pad of Claim 1, with the additional feature of a "kicktail." '051 Patent, 10:10-12. Claims 11-13 ascribe various limitations to the kicktail of Claim 10; Claim 13 specifies that the kicktail "occup[ies] *approximately one-fourth to one-fifth*" of the top surface of the pad, and that the back end has a significantly decreased slope as compared to the front end, the area of lesser slope "occupying *approximately three-fourths to four-fifths*" of the top surface. '051 Patent, 10:28-32 (disputed terms italicized).

Claim 14 describes the traction pad of Claim 1 with the additional feature of "an arch support." '051 Patent, 10:34-36. Claim 15 describes the traction pad of Claim 14, with additional limitations as to the configuration of the arch support.

Claim 16 describes the traction pad of Claim 1, with additional limitations such that the top surface better matches the contours of the user's foot. Claim 17 also describes the traction pad of Claim 1, with the limitation that the pad's low back end tapers to a point. Claim 18 likewise describes the traction pad of Claim 1, with limitations as to the material of which it is constructed.

Claim 20, the last claim dependent on Claim 1, describes a wakeboard incorporating the traction pad of Claim 1.

Claim 19, the second independent claim of the '051 Patent, like independent Claim 1,

describes: "[a] *wakeboard traction pad* for providing sure-footed engagement of a wakeboard by a rider thereof." '051 Patent, 11:7-8 (disputed terms italicized). However, unlike independent Claim 1, Claim 19 incorporates limitations equivalent to all of those described in each of dependent Claims 2-18. Here, of particular relevance are the "*roughened surface*" of the top surface of the traction pad of Claim 19, described in terms equivalent to those used in dependent Claim 2, '051 Patent, 11:9-12 (disputed terms italicized); the limitations as to the dimensions of the high front end of the traction pad, described in terms equivalent to those used in dependent Claims 5 and 6, *see* '051 Patent, 11:20-22; the limitations as to the dimensions of the low back end of the traction pad, described in terms equivalent to those used in dependent Claims 7 and 8, *see* '051 Patent, 11:23-29; the limitations as to the dimensions of the kicktail, described in terms equivalent to those used in dependent Claim 13, *see* '051 Patent, 11:37-50; and the arch support, described in terms equivalent to those used in dependent Claims 14 and 15, *see* '051 Patent, 12:1-8.

      Claim 21, the third independent claim of the '051 Patent, describes:

> A *wakeboard traction surface* for a wakeboard, comprising:
> > a sloping surface, said sloping surface defined between a *high front end* and a *low back end* to provide an angled traction surface and to provide the rider traction upon the wakeboard while riding the wakeboard, said *high front end* terminating in a kicktail; and ;
> > an arch support, said arch support defined upon said sloping surface; whereby:
> > greater control and traction are delivered to a rider of the wakeboard incorporating the *wakeboard traction surface*.

'051 Patent, 12:34-45 (disputed terms italicized). Claim 22 is dependent on Claim 21, describing "[a] wakeboard incorporating the traction pad of claim 21." '051 Patent, 12:46-47.

Page 5 - OPINION AND ORDER

**APPLICABLE LAW**

"A determination of infringement requires a two-step analysis. First, the court determines the scope and meaning of the patent claims asserted, and then the properly construed claims are compared to the allegedly infringing device." *Abraxis Bioscience, Inc. v. Mayne Pharma Inc.*, 467 F.3d 1370, 1375 (Fed. Cir. 2006). Claim construction is a matter of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*).

A.   **Sources of Evidence**

To construe the claims of a patent, the district court looks primarily to three sources: the claims, the specification, and, if entered into evidence, the prosecution history. *See Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir. 1991). In some cases, the court may rely on other, extrinsic evidence (including expert testimony), in interpreting these sources of intrinsic evidence. *Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 631 (Fed. Cir. 1987). However, "[i]n most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

B.   **Claim Language**

When construing claims, the analysis begins with, and must focus on, the language of the claims themselves. *See Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). The words of a claim "are generally given their ordinary and customary meaning," that is, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-1313 (Fed. Cir. 2005) *(en banc)* (citations omitted). "In some cases, the ordinary meaning of claim language

as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

If the claim language is clear on its face, then the rest of the intrinsic evidence is considered only for whether any deviation from the plain meaning is specified. *See Interactive Gift*, 256 F.3d at 1331. Deviation may be warranted if, for example, the patentee has "chosen to be his own lexicographer," or if the patentee has disclaimed a certain portion of the claim scope that would otherwise be afforded by the plain meaning. *Id.* (citations omitted). Where the claim language is not clear, other intrinsic evidence may be considered to resolve the lack of clarity. *See id.*

Where the ordinary meaning of a claim term is not be readily apparent, the context in which a word appears in a claim will inform the construction of that word. *See Phillips*, 415 F.3d. at 1314. Similarly, other claims of the patent in question "can also be valuable sources of enlightenment as to the meaning of a claim term." *Id.* Because claim terms are normally used consistently throughout the patent, "the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* The presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim. *Id.* at 1315.

In addition, where a term has more than one common meaning, the patent disclosure "serves to point away from the improper meanings and toward the proper meanings." *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1300 (Fed. Cir. 2003) (citation omitted). If more than one definition is consistent with the usage of a term in the claims, the

term may be construed to encompass all consistent meanings. *See Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1203 (Fed. Cir. 2002).

Where a claim uses different terms, the terms are presumed to have different meanings. *See*, *e.g.*, *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of . . . different terms in the claims connotes different meanings."); *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ("the use of two terms in a claim requires that they connote different meanings. . . .").

**C.    Specification**

Patent claims must be read in light of the specification. *See Markman*, 52 F.3d at 979. The specification "is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. Where a claim term has multiple, yet potentially consistent, definitions, the rest of the intrinsic record, beginning with the specification, can provide further guidance. *See Brookhill-Wilk*, 334 F.3d at 1300. If the patentee acted as his own lexicographer by explicitly defining a claim term in the specification, the term is construed according to the provided definition rather than the ordinary meaning of the term. *See CCS Fitness v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). Moreover, the specification may define a term by implication. *See Phillips*, 415 F.3d at 1321. The specification may also function to limit the claims' scope by indicating that the invention and all of its embodiments fall within only a narrow portion of the potentially broader meaning of a claim term. *See SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001).

It is error, however, to impute to the claim a limitation merely inferred from the

embodiments described in the specification. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 905 (Fed. Cir. 2004). Without more, an embodiment disclosed in the specification may not limit the claims. *Id.* at 906. Even when the specification describes only a single embodiment, the claims of the patent are not to be construed as restricted to that embodiment unless the patentee demonstrates a clear intention to limit the claim scope using "words or expressions of manifest exclusion or restriction." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). Absent clear statements of scope, courts are constrained to follow the language of the claims and not that of the written description provided by the specification. *See id.* at 1328; *see also Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988). Indeed, it is well settled that "a claim must explicitly recite a term in need of definition before a definition may enter the claim from the written description. This is so because the claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). The *Renishaw* court stated, further, that:

> a party wishing to use statements in the written description to confine or otherwise affect a patent's scope must, at the very least, point to a term or terms in the claim with which to draw in those statements. Without any claim term that is susceptible of clarification by the written description, there is no legitimate way to narrow the property right.

*Id.*; *see also id.* at 1249 ("If we need not rely on a limitation to interpret what the patentee meant by a particular term or phrase in a claim, that limitation is "extraneous" and cannot constrain the claim").

Absent extraordinary circumstances, by contrast, claims should be construed so as to include within their scope any preferred embodiment described in the specification. *See*, *e.g.*, *Vitronics*, 90 F.3d at 1583 ("an interpretation [pursuant to which the preferred embodiment falls

Page 9 - OPINION AND ORDER

outside the scope of the claims] is rarely, if ever, correct and would require highly persuasive evidentiary support"); *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996) ("it is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in this field would read the specification in such a way").

## CONSTRUCTION

### A.    "wakeboard traction pad"

Defendants contend that "wakeboard traction pad" must be construed to mean "a pad that is approximately the size of a human foot in square area, that includes a central ridge generally traveling the length of the pad to provide a central arch support, and that can be attached to a wakeboard."  Defendants argue that the limitations as to approximate size and as to arch support must be read into the definition if the plain language cited above of the abstract ("[t]he wakeboard traction pad has . . . a center arch support") and of the specification ("approximately the size of a human foot in square area," '051 Patent, 3:13-14; "a central arch support is provided," '051 Patent, 3:29-33) is to be given its proper effect.  The size limitations appear in independent Claim 19 and dependent Claims 5-8, and the arch support limitation appears in independent Claim 21 and dependent Claims 14 and 15; neither limitation is to be found in independent Claim 1.

By contrast, Messer proposes that the term be construed to mean "a high-friction, high-surface area surface."  The proposed "high-friction" limitation may relate to the "for providing sure-footed engagement" clause of independent Claims 1 and 19; the "high-surface area" limitation may relate to the contour-fitting limitation described in independent Claim 19 and

dependent Claim 16, but does not appear to have any referent in the language of independent Claim 1.

The size and arch support limitations proposed by defendant and the "high-surface area" limitation proposed by Messer are not supported by the ordinary and customary meaning of the words used in the disputed term, nor do they receive support from the context in which the term appears in the claim language. Indeed, the proposed limitations appear only in claims dependent on Claim 1 and not in Claim 1 itself, giving rise to a presumption that the limitations are not present in the independent claim. *See Phillips*, 415 F.3d. at 1315. Because the term "wakeboard traction pad" is used in Claim 1, the presumption suggests that the disputed term cannot be construed to include any of these three limitations.

Moreover, the size and arch support limitations proposed by defendants are drawn, in part, from language in the specification. However, the words used in independent Claim 1 are not subject to the clarifications defendants propose, and therefore the claim cannot be so constrained on the basis of the specification language. *See Renishaw*, 158 F.3d 1248-1249.

Finally, nothing in the prosecution history submitted into evidence suggests that the disputed term should be given a construction that deviates from that suggested by its ordinary and customary meaning and its context within the claims.

For the foregoing reasons, I reject as unsupported the size and arch support limitations proposed by defendants and the "high-surface area" limitation proposed by Messer, and conclude instead that the term "wakeboard traction pad" should be construed to mean "a pad with a friction-enhancing top surface, the bottom surface of which may be attached to the top surface of a wakeboard."

B.      "wakeboard traction surface"

The term "wakeboard traction surface" appears only once in the patent claims, as the subject of independent Claim 21[1].  Defendants contend that "wakeboard traction surface" should be construed to mean "the top surface of a wakeboard traction pad."  Messer argues that the term should instead be construed to mean "any friction-enhancing finish or surface placed on the top surface of a wakeboard."

Both proposed definitions entail difficulties.  On defendants' proposed construal, the terms "wakeboard traction surface" and "wakeboard traction pad," while not precisely synonymous, could be used interchangeably without changing the scope of the patent claims' coverage.  However, applicable case law instructs that, in the absence of evidence to the contrary, different terms should be construed as connoting distinct meanings.  *See CAE Screenplates*, 224 F.3d at 1317; *Applied Med.*, 448 F.3d at 1333 n.3.

Plaintiff's proposed construal, by contrast, falls afoul of dependent Claim 22, which describes "[a] wakeboard incorporating the *traction pad* of claim 21."  '051 Patent, 12:46-47 (emphasis supplied).  It is presumed that patent terms have the same meaning wherever they are used in a patent, *see Phillips*, 415 F.3d. at 1314, and the reference in Claim 22 to a "traction pad" described in Claim 21 suggests that a "wakeboard traction surface" must in some sense constitute or form part of a traction pad.

Although the conflict between these principles of patent construction suggests the possibility of a drafting error, in which either the word "surface" in Claim 21 or the word "pad"

---

[1]Claim 21 describes "[a] wakeboard traction surface . . . comprising. . . a sloping surface. . . defined between a high front end and a low back end . . . , said high front end terminating in a kicktail; and . . . an arch support. . . defined upon said sloping surface."  '051 Patent, 12:36-42.

Page 12 - OPINION AND ORDER

in Claim 22 was mistakenly selected, it is not for this court to determine the patent applicant's intent in selecting particular claim terms. *See Markman*, 52 F.3d at 985 ("No inquiry as to the subjective intent of the applicant or PTO is appropriate or even possible in the context of a patent infringement suit. The subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim. . ."). Instead, this court must look to the claim language as approved by the Patent and Trademark Office and construe the claims for what they actually recite, adhering as closely as possible to the principles of patent construction set forth above.

      The language of Claim 21 provides support for Messer's contention that "wakeboard traction surface" must be construed as distinct from a "wakeboard traction pad." The claim expressly describes "a sloping surface," the contours of which serve to define characteristics or to perform functions elsewhere described, in different terms, as features of a pad. Specifically, the language of Claim 21 describing the arch support of the traction surface can be contrasted with the language of dependent Claim 15 and independent Claim 19 describing a pad incorporating an arch support; the latter language expressly describes a ridge traveling along the top surface of the pad from one end of the pad to the other, *see* '051 Patent, 10:39-42, 12:1-4, whereas the former language defines the arch support purely as a characteristic of the "sloping surface," *see* '051 Patent, 12:41-42. The focus in the claim language on the contours of the surface suggests that the traction surface of Claim 21 is intended to overlay a contoured substrate, rather than merely to constitute one side of a pad such as that claimed in Claims 1 or 19.

      For the foregoing reasons, I reject the construction proposed by defendants, and conclude

instead that the term "wakeboard traction surface" should be construed to mean "a friction-enhancing finish or surface material that may adhere or be attached to the top surface of a wakeboard."

### C. "end," "high front end," and "low back end"

Defendants contend that "end" should be construed to mean "either extremity of an object having length," that "high front end" should be construed to mean "the end of the wakeboard traction pad that has a height that is greater than the other end," and that "low back end" should be construed to mean "the end of the wakeboard traction pad that has a height that is less than the height of the high front end and is opposite the high front end." Messer suggests that "end" need not be construed independently of the claim terms in which it invariably appears, "high front end" and "low back end," and contends that "high front end" should be construed to mean "one end of the wakeboard traction pad, having a height," and that "low back end" should be construed to mean "located opposite from the front end, an actual or construed end located near the mid-point of the wakeboard, having a height that is equal to or less than the front end."

Both sets of proposed constructions suffer from the flaw that the two kinds of "end" are each defined as constituting an extremity of a "wakeboard traction pad;" because Claim 21 describes the "wakeboard traction surface" as "defined between a high front end and a low back end," '051 Patent, 12:36-37, the terms must be construed as equally applicable to wakeboard traction pads and surfaces.

Moreover, Messer's proposed construction violates the ordinary and customary meaning of the words used in the claim terms, without any basis for doing so. Messer's construction would permit the high front end and low back end to be of equal height, whereas the patent

Page 14 - OPINION AND ORDER

claims clearly specify that the low back end shall have a height lower than the high front end.

For the foregoing reasons, I reject the construction proposed by Messer, and conclude instead that the term "end" should be construed to mean "one of the two opposite extremities either of an object having length or of a sloped surface," that the term "high front end" should be construed to mean "an end that has a height greater than the height of its opposite end," and that the term "low back end" should be construed to mean "an end that has a height less than the height of its opposite end."

### D.     "height"

All parties contend that "height" should be construed to mean "the distance between the bottom and top surfaces of the wakeboard traction pad." The term appears in independent Claims 1 and 19, but not in independent Claim 21.

The proposed construction defines the term as though applicable only to a wakeboard traction pad. Although the *term* "height" appears only in claims describing wakeboard traction *pads*, I have used the *word* "height" in construing the claim terms "high front end" and "low back end," which are used in Claim 21 in reference to a wakeboard traction *surface*. In order to avoid confusion, it is prudent to construe the claim term "height" both in accordance with the ordinary and customary meaning of the word and in such a manner that it can apply generally to any vertical dimension.

For the foregoing reasons, I conclude that the term "height" should be construed to mean "the distance between the bottom and top surfaces of an object or between the lowest and highest points of a cognizable portion of an object."

Page 15 - OPINION AND ORDER

### E. "roughened surface"

All parties contend that "roughened surface" should be construed to mean "a non-slip finish or surface." The term appears in dependent Claim 2 and independent Claim 19. The proposed construction is in keeping with the ordinary and customary meaning of the words of the term, and the claim language does not suggest any need for recourse to other sources of evidence. I therefore conclude that the term "roughened surface" should be construed as the parties propose.

### F. "approximately one and one half inches," "approximately nine and one half inches," "approximately one fourth inch," and "approximately eleven and one fourth inches"

All parties contend (i) that "approximately one and one half inches" should be construed to mean "no less than one and three-eighths inches and no greater than one and five-eighths inches," (ii) that "approximately nine and one half inches" should be construed to mean "no less than nine and three-eighths inches and no greater than nine and five-eighths inches," (iii) that "approximately one fourth inch" should be construed to mean "no less than one eighth of an inch and no greater than three eighths of an inch," and (iv) that "approximately eleven and one fourth inches" should be construed to mean "no less than eleven and one-eighth inches and no greater than eleven and three-eighths inches." The terms appear in dependent Claims 5-8 and independent Claim 19. The proposed constructions are in keeping with the ordinary and customary meaning of the words of the terms, and the claim language does not suggest any need for recourse to other sources of evidence. I therefore conclude that these related terms should be construed as the parties propose.

G.     **"approximately one fourth to one fifth" and "approximately three fourths to four fifths"**

All parties contend that "approximately one fourth to one fifth" should be construed to mean "no less than one fifth and no greater than one fourth," and that "approximately three fourths to four fifths" should be construed to mean "no less than three fourths and no greater than four fifths." The terms appear in dependent Claim 13 and independent Claim 19.

The proposed constructions ignore the presence of the word "approximately", which the parties would treat as meaningless (or as having the same meaning as "precisely"). This court does not construe a claim term as meaningless absent a sound evidentiary basis for so doing. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so").

Applicable Federal Circuit case law establishes that the words "approximately" and "about" have functionally equivalent meanings within a patent claim. *See*, *e.g.*, *Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.*, 476 F.3d 1321, 1326 (Fed. Cir. 2007); *Andrew Corp. v. Gabriel Electronics, Inc.*, 847 F.2d 819, 821-822 (Fed. Cir. 1988). With respect to the word "about," the Federal Circuit has held that the term "does not have a universal meaning in patent claims," but rather that "the meaning depends upon the technological facts of the particular case." *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1217 (Fed. Cir. 1995). The *Pall* court held that:

> The use of the word "about" avoids a strict numerical boundary to the specified parameter. Its range must be interpreted in its technological and stylistic context. We thus consider how the term . . . was used in the patent specification, the prosecution history, and other claims. It is appropriate to consider the effects of varying that parameter, for the inventor's intended meaning is relevant. Extrinsic

Page 17 - OPINION AND ORDER

> evidence of meaning and usage in the art may be helpful in determining the criticality of the parameter, and may be received from the inventor and others skilled in the field of the invention.

*Id.*; *see also Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556 (Fed. Cir. 1994) (discussing the criticality of the claimed ratio to the invention and whether or not one of ordinary skill in the art would have read the modifier "about" expansively in light of the intrinsic evidence); *Ortho-McNeil*, 476 F.3d at 1326-1327 (determining how narrowly to constrain the term "about" by reference to the criticality of the claimed ratio to the patented invention).

Here, the only intrinsic evidence of the criticality of the ratios inheres in the fact that an approximate range has been specified, rather than a single value. The only extrinsic evidence of criticality offered by either party lies in the fact that through his counsel at oral argument, Messer expressed himself willing to stipulate to defendants' proposed constructions. This evidence suggests that precision in the specified ratios is not significantly critical to the claimed invention.

For the foregoing reasons, I reject the construction proposed by the parties, and conclude instead that the term "approximately one fourth to one fifth" should be construed to mean "no less than fifteen and no more than thirty percent," and that the term "approximately three fourths

///

///

///

///

///

///

to four fifths" should be construed to mean "no less than seventy and no more than eighty-five percent."

## CONCLUSION

The claim terms are construed as stated above.

Dated this 9th day of July, 2007.

      /s/  Paul Papak
Honorable Paul Papak
United States Magistrate Judge